Robert BRONSTEIN

v.

Bernard BRONSTEIN.

Civ. A. No. 75–2336.

United States District Court, E. D. Pennsylvania.

Feb. 12, 1976.

Henry A. Stein, Richard P. Jaffe, Philadelphia, Pa., for plaintiff.

H. Robert Fiebach, Joseph E. Murphy, Philadelphia, Pa., for defendant.

## MEMORANDUM

HUYETT, District Judge.

This action arising out of a sale and purchase of stock is brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1934 Act), and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.-10b–5, with jurisdiction invoked pursuant to 15 U.S.C. § 78aa. Plaintiff has also invoked the pendent jurisdiction of this Court over claims arising under the Pennsylvania Securities Act of 1972, 70 P.S. § 1–401, and under common law fraud. The critical transaction as outlined in the complaint was the purchase by defendant Bernard Bronstein of plaintiff Robert Bronstein's stock in Penn Tower Development Corporation (Penn Tower). Plaintiff alleges that defendant induced the sale by making various untrue statements of material facts and by omitting to state other material facts, the purpose and effect of which was to cause plaintiff to sell all of his stock in Penn Tower for a price substantially below the fair market value. Contending that the complaint does not allege the sale or purchase of a security as defined in 15 U.S.C. § 78c(a), defendant moves to dismiss the complaint for lack of subject matter jurisdiction. We deny the motion.

Taking as true the well-pleaded allegations of the complaint, as we must in considering a motion to dismiss, we find presented the following scenario. Plaintiff and defendant in this action are brothers. Prior to November 13, 1970, plaintiff, defendant, and their father, Solomon Bronstein, each owned one-third of the outstanding capital stock of Penn Tower, a Pennsylvania corporation engaged in the business of real estate acquisition and development. Although both brothers were officers and directors of the corporation, their corporate duties differed—defendant handled all of Penn Tower's financial matters, while plaintiff was employed by Penn Tower as a "field supervisor" in charge of construction activities. Plaintiff, unversed in land values and business generally, relied completely on defendant for information and advice on the financial success of Penn Tower and the value of its assets. Defendant, knowing plaintiff's inexperience, told plaintiff not to retain his own attorney but to rely instead on defendant's attorney since defendant, as a brother, was looking out for plaintiff's interests. Despite these assurances, defendant induced plaintiff to sell his stock by making the following misrepresentations and omissions: (a) defendant assured plaintiff that unaudited financial statements dated October 31, 1970, reflected the actual fair market value of Penn Tower stock, when in fact defendant knew that such statements did not accurately reflect the fair market value of the stock; (b) defendant knew and failed to disclose that the true fair market value of plaintiff's stock was in excess of $250,000; (c) defendant knew and failed to disclose that the October finan-

cial statements did not reflect (i) the actual fair market value of land, Penn Tower's principal asset; (ii) the actual value of construction in progress; or (iii) the profits to be realized upon the sale of construction in progress. In reliance upon these misrepresentations of defendant, plaintiff on November 13, 1970, entered into a contractual agreement which, among other things, granted defendant the option to purchase plaintiff's stock in Penn Tower for the greater of $70,000 or the book value of plaintiff's shares. Prior to January 7, 1971, plaintiff sold his stock to defendant for the sum of $72,813.33, less the obligation to repay the defendant the sum of $45,000 at a subsequent date, or for the net price of $27,813.33. Plaintiff now seeks to rescind the November agreement or to receive monetary damages.

Defendant first moves to dismiss Count I, the federal count.[1] He contends that the sale of stock in Penn Tower does not constitute the sale of a "security" as that term is defined in Section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), which provides in pertinent part:

> [W]hen used in this title, unless the context otherwise requires— . . . (10) the term "security" means any note, stock, . . . certificate of interest or participation in any profit-sharing agreement . . . , investment contract, . . . or in general, any instrument commonly known as a "security" . . . .

Although defendant concedes that the sale in question transferred an instrument which, by its denomination as stock, is, literally, covered by Section 3(a)(10), nevertheless, defendant argues that the introductory phrase "unless the context otherwise requires" limits the application of the definitional classifications and signals that the mere designation of an instrument as stock does not necessarily transform it into a security

covered by the 1934 Act. To support this proposition defendant refers us to cases in which courts elevated substance over hollow form in determining whether a particular instrument is a covered security under the Acts. Defendant contends that the business arrangement described in plaintiff's complaint is in substance a family partnership and that the Penn Tower shares that plaintiff sold to his brother were interests in real estate, not securities. At the heart of defendant's assumptions are the views adopted by several courts that the key factor in determining whether or not a partnership interest is a security is the degree of a partner's participation in the venture. *Romney v. Richard Prows Inc.*, 289 F.Supp. 313 (D.Utah 1968); *Polikoff v. Levy*, 55 Ill.App.2d 229, 204 N.E.2d 807, *cert. denied*, 382 U.S. 903, 86 S.Ct. 237, 15 L.Ed.2d 156 (1965). Since the complaint reveals that plaintiff was both employed by Penn Tower as a field supervisor in charge of construction activities and as an officer and director of the corporation, defendant asserts that this is not a case involving an outside investor who entrusted money to strangers for a return on his investment, and that despite his transfer of corporation stock, plaintiff does not therefore fall within the umbrella of protection afforded by the federal securities laws. In short, defendant argues that the transaction in question is not a proper subject for federal securities regulation because it involves the sale of an interest in a small family business in which plaintiff was an active participant.

Defendant relies heavily on the recent Supreme Court ruling in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) to support his position. Based partly on our reading of the case, however, we find defendant's theory untenable. In *Forman* the issue was whether shares of stock in a state-subsidized cooperative apartment known as Co-Op City were

---

1. Defendant also moves to dismiss Counts II and III, the state counts. We note that although we will take pendent jurisdiction of the common law fraud count, we await further pretrial briefing on the applicability of the Pennsylvania Securities Act of 1972.

securities within the purview of the securities laws. In part "A" of its opinion, the Court rejected the contention that the mere labelling of the shares as "stock" invokes per se the special anti-fraud protections afforded by the federal acts.[2] Proper construction of the Acts, the Court noted, requires that the economic realities underlying a purchase transaction prevail over its form. 421 U.S. at 849, 95 S.Ct. 2051. The Court recognized, however, that if the applicability of the Acts depended in all cases solely on the economic realities of · a transaction, an investor might be unjustly misled by the use of a particular label and form to believe his purchase protected by the securities laws. Consequently, the Court stated that when the existence of a covered security is in issue, the name given to an instrument cannot be disregarded, and may, in fact, be highly relevant, especially if the instrument possesses some of the intrinsic features customarily associated with it.

"In holding that the name given to an instrument is not dispositive, we do not suggest that the name is wholly irrelevant to the decision whether it is a security. There may be occasions when the use of a traditional name such as 'stocks' or 'bonds' will lead a purchaser justifiably to assume that the federal securities laws apply. *This would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument.*" (emphasis added). 421 U.S. at 850–51, 95 S.Ct. at 2059.

Thus the Court posited that the presence in some cases of a traditional label and form would itself support the finding of a protected security; any other interpretation would unfairly defeat a purchaser's or seller's reasonable expectations.

The Court went on to conclude, however, that it would defy common sense to suggest that residents of Co-Op City, who intended to acquire only low-cost residential apartments, believed that they actually purchased investment securities simply because the transaction was evidenced by paper denominated "stock". Despite their name, the Court noted that "[t]hese shares have none of the characteristics 'that in our commercial world fall within the ordinary concept of a security.'" 421 U.S. at 851, 95 S.Ct. at 2060. The Court went on to list several attributes common to most stocks that it found lacking in the Co-Op City shares, including a right to receive dividends, negotiability, voting rights in proportion to the number of shares owned, appreciation in value, and the ability to be pledged or hypothecated. Based on these findings the Court determined that the inducement for purchasing Co-Op City shares was housing, not investment for profit, and held that the shares were not stock as defined under the federal securities laws. 421 U.S. at 851, 95 S.Ct. 2051.

■ The essential facts in our case are markedly different from those in *Forman*, however. In contrast to what were merely labelled shares of stock in *Forman*, the shares here are unquestionably stock. No party contends that Penn Tower is not a duly incorporated and validly existing Pennsylvania corporation. Furthermore, the Penn Tower shares, possessing as they do many features codified under Pennsylvania state law as characteristic of stock shares, would lead the reasonable investor to believe that the shares he had bought were indeed stock. For example, the shares are represented by a certificate, 15 P.S. § 1607; they're transferable in accordance with corporate by-laws, 15 P.S. § 1613; they entitle the holder to voting rights, 15 P.S. § 1504; and dividends, 15 P.S. § 1702. Quite obviously, then, the Penn Tower shares are formally indistin-

---

**2.** "We reject at the outset any suggestion that the present transaction evidenced by the sale of shares called 'stock,' must be considered a security transaction simply because the statutory definition of a security includes the words 'any . . . stock.'" 421 U.S. at 848, 95 S.Ct. at 2058.

guishable from traditional shares of stock. *See Grenader v. Spitz*, 1975 CCG § 95,300 (S.D.N.Y. September 29, 1975).

■ Despite such formal legal character of the Penn Tower shares, however, defendant argues that plaintiff's participation in a closely held family corporation precludes him from relief under the 1934 Act. Although defendant's theory has a certain appeal, it is finally unpersuasive. Mindful of the Supreme Court's instruction that the federal securities laws are remedial measures and must be construed flexibly and liberally to effectuate their purposes, *Tcherepnin v. Knight*, 389 U.S. 322, 337, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), we must resist defendant's invitation to delve into the workings of a validly existing business corporation and the relationship of the shareholders, just to make the threshold determination of jurisdiction. Our resistance is especially strong in a case such as this where the inquiry defendant urges could thwart the reasonable expectations of a seller of instruments which, by label and form, would appear, undeniably, to be covered securities. Such inquiry has been necessary only in rare cases, such as *Forman*, when an instrument denominated as stock lacked the characteristics traditionally associated with stock. Defendant has cited no cases in which a court has pursued such an inquiry when the purchase and sale involved bona fide shares of capital stock of a corporation. Defendant instead relies on cases dealing with other types of securities, such as "investment contracts" and "notes," to argue that plaintiff, because of his activities in Penn

Tower's operations, is not a person whom the federal securities laws were designed to protect.

Such reliance is misplaced. The sole reason courts have become involved in analyzing the term "investment contract" is that there exists no statutory or common law definition of that term. The classic test for identifying an investment contract appears in *S. E. C. v. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1945). In *Howey* the Supreme Court elevated substance over form to bring within securities law coverage items not commonly referred to as securities, but possessing the substantive characteristics of securities. Noting that the Acts fail to define the term "investment contract," the Court stated that what distinguishes a transaction involving an investment contract from other commercial dealings is that "the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301, 66 S.Ct. at 1104.

■ While the *Howey* test, especially the language "solely from efforts of others," has helped courts to identify the somewhat elusive investment contract, its applicability to other less elusive types of securities is debatable.[3] In any event, since stock, one of the most common forms of securities, carries a traditional and accepted meaning, it is not necessary, as defendant contends, for purposes of section 10(b) that Penn Tower stock meet the test used to identify an investment contract. Indeed, the *Forman* decision strongly suggests such a conclusion. The Court in *Forman* ap-

---

**3.** We note in passing that numerous questions have arisen as to the effect of active investor participation in an enterprise that might otherwise be characterized an investment contract. The primary concern in this regard has been that if the word "solely" as used in the *Howey* test is interpreted literally, unscrupulous promoters could circumvent the securities laws easily by requiring the investor to contribute a modicum of effort. Thus, an increasing number of courts have retreated from a literal application of the *Howey* test and have held that

an investment contract may exist in situations in which the investor expends nominal efforts, provided that the significant managerial efforts, those affecting the success or failure of the enterprise, are made by others. *S. E. C. v. Koscot Interplanetary Inc.*, 497 F.2d 473, 480 (5th Cir. 1974); *Nash & Associates, Inc. v. Lum's of Ohio, Inc.*, 484 F.2d 392, 395 (6th Cir. 1973); *S. E. C. v. Glenn Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

plied the *Howey* test only in part "B" of its opinion, when it determined that the Co-Op City shares were not "investment contracts." By contrast, the Court did not utilize the *Howey* test in making its earlier finding that the Co-Op City shares did not constitute "stock."[4]

■ We find further that cases holding that promissory notes are not "securities," despite their literal coverage under the Acts, are also distinguishable from this case. The question whether a note constitutes a covered security depends on whether the note was procured for purposes of speculation or investment or for purposes of making a commercial loan. As a matter of policy, this distinction is a valid one. The federal securities laws are designed to protect investors, not persons engaged in ordinary consumer or commercial loan transactions. Moreover, subjecting ordinary loan transactions to federal securities law regulation would unnecessarily burden commercial paper markets. Thus courts have restricted application of the Acts to those notes procured for investment and have excluded notes issued in the context of a commercial loan transaction. *McClure v. First Nat'l. Bank*, 497 F.2d 490 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Lino v. City Investing Co.*, 487 F.2d 689 (3d Cir. 1973); *Zeller v. Bogue Electric Mftg. Corp.*, 476 F.2d 795, 800 (2d Cir. 1972), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 416 (1973); *Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075, 1080 (7th Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). In finding that the notes in question were commercial rather than investment paper, the courts in both *McClure* and *Lino* did emphasize that the notes were not publicly issued but exchanged in face to face transactions.

Defendant, seizing upon this distinction, asserts that a similar emphasis here must lead us to conclude that the sale of plaintiff's stock in Penn Tower is not covered by the 1934 Act. We do not so conclude.

The reason courts have become involved in determining whether a note constitutes a security under the Acts is because instruments denominated notes can be either commercial or investment in nature. Shares of stock in a closely held family corporation do not possess such dual characteristics. Shareholders acquire these shares not with an eye towards personal use or consumption of the underlying interest (which, the Supreme Court found, was the motive of the Co-Op City tenants in *Forman*, 421 U.S. 837, 851, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)), but rather for the purpose of acquiring an interest in a profit-making venture. An ordinary commercial loan, on the other hand, does not involve the "purchase" of a security. For example, in *Lino* plaintiff purchased a franchise sales center license from defendant and paid with cash and notes. The court held that the transaction was commercial in nature and did not involve the purchase of securities by defendant. The court reasoned that defendant sold a right to operate a franchise sales center and accepted the note, not to invest in Lino's franchise, but to finance the franchise. Similarly, the court in *Bellah v. First Nat'l. Bank*, 495 F.2d 1109, 1113–14 (5th Cir. 1974), held that notes executed and delivered to a bank were ordinary commercial loans and fell outside the purview of the Act. The court explained that in extending the loans, the bank merely intended to aid plaintiffs in the operation of their livestock business. In accepting the notes, however, the bank did not seek to profit from the successful

---

4. The cases cited by defendant involving the sale of partnership interests are similarly distinguishable from the case at hand. *Polikoff v. Levy, supra; Romney v. Richard Prows, Inc., supra.* In both *Polikoff* and *Romney* the courts applied the *Howey* test and held that the interests were not covered securities be-

cause the purchaser did not expect to receive profits solely from the efforts of others. We might be persuaded by these decisions if plaintiff here had not held stock in Penn Tower but instead owned some other less easily defined interest in the enterprise.

operation of the enterprise. Unlike these cases, where the lender did not acquire the note for speculation or investment, this case involves a defendant who clearly purchased his brother's stock in Penn Tower with the hope of realizing a return commensurate with the success of the business.

■ Finally, to accept defendant's arguments and deny jurisdiction on the ground that an aggrieved shareholder's participation in the operations of a closely held family corporation precludes relief under the 1934 Act could lead to the conclusion that any stock owned by persons involved in the management of a corporation would not constitute stock under the federal securities laws. Such a conclusion, however, would ignore precedent dealing with corporate insider liability. *See, e. g., S. E. C. v. Texas Gulf Sulfur Co.,* 401 F.2d 833 (2d Cir. 1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Nor have courts held that the federal securities laws should not apply when shares of a corporation are closely held, *e. g., Thomas v. Duralite Co., Inc.,* 524 F.2d 577 (3d Cir. 1975), *Rochez Bros., Inc. v. Rhoades,* 390 F.Supp. 470 (3d Cir. 1975), *aff'g* 527 F.2d 880 (W.D.Pa.1974), *enforcing* 491 F.2d 402 (3d Cir. 1974), *aff'g and remanding in part,* 353 F.Supp. 795 (W.D. Pa.1973), or where such shares are held by persons related to each other. *E. g., Kardon v. Nat'l. Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946), 73 F.Supp. 798 (E.D. Pa.), *on request for additional findings of fact,* 83 F.Supp. 813 (E.D.Pa.1947). Moreover, in the case of the sale and purchase of stock, it is well-settled that section 10(b) applies to face to face transactions between private individuals and outside the organized securities markets. *E. g., Matheson v. Armbrust,* 284 F.2d 670, 674 (9th Cir. 1960), *cert. denied,* 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860 (1961); *Hooper v. Mountain States Securities Corp.,* 282 F.2d 195, 201 (5th Cir. 1960).

In sum, then, we find that neither the analysis of the Supreme Court in *Forman* nor the lines of cases dealing with investment contracts and promissory notes preclude our assumption of jurisdiction in this action. Rather we find that plaintiff's sale of instruments that the reasonable person could not but view as shares of stock is clearly a transaction afforded protection by the 1934 Act. We, therefore, deny defendant's motion to dismiss the complaint.